# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF OKLAHOMA

FILED
DEC 1 4 2009
WILLIAM B. GUTHRIE
Clerk, U.S. District Court
By_____
Deputy Clerk

TREVOR MITCHELL,

    Petitioner,

v.

JUSTIN JONES, DOC Director,

    Respondent.

Case No. CIV 06-503-RAW-KEW

## REPORT AND RECOMMENDATION

This matter is before the Magistrate Judge on petitioner's petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254. Petitioner, an inmate currently incarcerated at Davis Correctional Facility in Holdenville, Oklahoma, attacks his conviction in Latimer County District Court Case No. CF-97-53 for Shooting with Intent to Kill (Count 3).[1] He has raised one ground for relief:

> The state appellate court's rejection of the Petitioner's claim that he was deprived of a fundamentally fair trial as a result of the prosecution's failure to provide a videotaped interview of co-defendant James Strickland by law enforcement is contrary to and constitutes an unreasonable application to the facts in the Petitioner's case of clearly established standards set forth by the United States Supreme Court in *Brady v. Maryland*. Additionally, the state appellate court's rejection of the Petitioner's claim was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

[Docket #2 at 6].

The respondent concedes that petitioner has exhausted his state court remedies for the

---

[1] Petitioner also was convicted of Burglary in the First Degree (Count 1), Assault and Battery with a Dangerous Weapon (Count 2), and Conspiracy to Commit a Felony (Count 4), but he is not challenging those convictions.

purpose of federal habeas corpus review and has submitted the following records to the court for consideration in this matter:

- A. Petitioner's direct appeal brief.

- B. The State's brief in petitioner's direct appeal.

- C. Summary Opinion affirming petitioner's Judgment and Sentence. *Mitchell v. State*, No. F-99-1272 (Okla. Crim. App. Dec. 18, 2000).

- D. Order denying petitioner's application for post-conviction relief. *State v. Mitchell*, No. CF-97-53 (Latimer County Dist. Ct. Feb. 15, 2006).

- E. Order Affirming Denial of Post-Conviction Relief. *Mitchell v. State*, No. PC-2006-270 (Okla. Crim. App. Sept. 21, 2006).

- F. Transcript of petitioner's jury trial, Original Record, and trial exhibits in Latimer County District Court Case No. CF-97-53.

## Facts

In the early morning hours of August 27, 1997, Dan and Cindy Murphy were asleep with their infant daughter in their Latimer County residence. (Tr. 54-55, 180). Petitioner cut the phone lines to the house, and he and James Strickland entered. (Tr. 205-06, 697-98). Mr. and Mrs. Murphy came out of their bedroom to investigate noises, with Mrs. Murphy carrying her .357 caliber five-shot revolver as they walked from the hallway into the kitchen area. (Tr. 59-62, 115-119). A short, stocky man with a huge head, who was dressed in camouflage and wearing a mask, suddenly jumped in front of Mr. Murphy and violently struck him twice above the waist with a club, knocking him down. (Tr. 119-22, 124). Mrs. Murphy fired at the attacker two or three times. (Tr. 122-24, 165-68, 173). She then saw the silhouette of a second, taller man who also was masked and in camouflage, and who was holding something that looked like a rifle butt. (Tr. 125-26, 168). She fired two or three

shots at him, too. (Tr. 125-28, 168-74). The short, stocky man yelled at the tall, slender man to "shoot her too" or "kill her too." (Tr. 129-30). Although the taller, skinny man was in a position to have shot her, he pointed the barrel of his gun down and shot the floor (Tr. 130-31, 174, 796, 800).

Realizing she was out of bullets, Mrs. Murphy returned to the bedroom to get more ammunition and to conceal her child under the bed. (Tr. 132-36, 175-76). While still in the bedroom, she heard two shots in the hallway and the thump of her husband's body collapsing against the wall. (Tr. 134-36, 175-76). She could hear her husband's guttural groans outside the door, and after the shooting stopped and she thought the intruders probably were gone, she returned to her husband who was seriously injured and bleeding profusely. (Tr. 138-39, 177-78). Realizing her husband would die without immediate medical attention, Mrs. Murphy cautiously moved through the house and looked out the window to make sure the intruders had left, before running to a neighbor for help. (Tr. 139-141, 143-45, 179).

Petitioner fled to Canada, and Mr. Murphy survived his serious injuries. (Tr. 66-67, 363, 738). Mr. Murphy had no memory of which man shot him, and Mrs. Murphy was not able to identify the shooter, because she was in the bedroom when her husband was shot. (Tr. 62, 103-04, 176, 801). At trial, petitioner and James Strickland blamed each other for Mr. Murphy's gunshot wounds that resulted in petitioner's charge of Shooting with Intent to Kill. Petitioner claimed Mr. Murphy had hired him to break into the house as part of an insurance scam.

The crime was presented on the television show "America's Most Wanted," and Gloria Wupori of Winnipeg, Manitoba, Canada, spoke to a representative of the Royal Canadian Mounted Police about the crime. (Docket #19 at 5; Tr. 358, 363). Ms. Wupori,

3

a live-in motel manager, testified petitioner was a motel resident who became her friend. (Tr. 358-60). Petitioner told Ms. Wupori that he was a fugitive from Oklahoma, and he had been shot in the face when he sought revenge against the person who had fired his father. (Tr. 361-63). Although she stated on direct examination that petitioner had not indicated to her that he had shot someone, on cross-examination Ms. Wupori testified that petitioner confessed to her that he did shoot someone during the confrontation. (Tr. 362-64).

Kevin Lightfoot testified that petitioner offered him $300 to help "rough up" someone. (Tr. 283-84). Lightfoot declined, and petitioner said he probably could find someone else for the job. (Tr. 284). About two hours later, petitioner and James Strickland showed up at Lightfoot's shop in separate vehicles. (Tr. 284-85). Both petitioner and Strickland were dressed in camouflage clothing, and they had two shotguns, a homemade club, and a leather scabbard. (Tr. 286-87). Lightfoot drove the other two men in petitioner's vehicle to an area near the Murphys' residence. (Tr. 287-88). Petitioner got out of the vehicle with the pump shotgun and the club in the scabbard, and Strickland left with the double-barreled shotgun. (Tr. 290-91). Lightfoot was supposed to return and pick up petitioner and Strickland, but when he heard about a shooting on his police scanner, he decided not to return. (Tr. 291-92). Jessie Lopez testified that petitioner showed up at his home wounded and asked for a ride to Lightfoot's residence. (Tr. 315-18). When Lopez delivered petitioner to Lightfoot's home, petitioner told Lightfoot that "the lady" shot him in his jaw. (Tr. 294, 300). Strickland arrived on foot at Lightfoot's residence about 30 minutes later and left in his truck. (Tr. 295).

Petitioner testified that in August 1997, Dan Murphy asked him "to do an insurance job." (Tr. 688). According to petitioner, Mr. Murphy offered to pay him $1,500 for his

4

assistance in committing insurance fraud. (Tr. 690-91). The plan was for Mr. Murphy to leave the window by the door open, so petitioner could enter, rough up Mr. Murphy, and tie up Mr. and Mrs. Murphy. (Tr. 690, 697). Mr. Murphy said he would give his baby something to make her sleep, so petitioner would not have to worry about her. (Tr. 690). According to petitioner, Mr. Murphy paid him $500 in advance, and told him he would get the rest of the money after petitioner returned Mr. Murphy's "stolen" computer, jewelry, and other items. (Tr. 692). Petitioner originally planned to carry out this plan by himself, but later he realized he would need help. (Tr. 693). James Strickland agreed to go with petitioner to Mr. Murphy's house to rough up Murphy and take his belongings, but Strickland wanted to take a weapon. (Tr. 694).

According to petitioner, Kevin Lightfoot drove them to the area, and upon arriving at the Murphys' home, petitioner cut the phone lines, and entered through the window. (Tr. 697). He then opened the front door, so Strickland could come into the house. (Tr. 698). As allegedly planned, petitioner started beating the floor and wall to announce his arrival to Mr. Murphy. (Tr. 698). When Mr. Murphy came out of the bedroom, petitioner stepped in front of him, holding the club over his head. (Tr. 699). Mr. Murphy then shot petitioner in the face. (Tr. 699). Thinking Mr. Murphy had tried to kill him, petitioner took the club and hit Murphy across his head to get Murphy away from him. (Tr. 699). Petitioner claimed he tried to get out the back door as quickly as possible, but he was unable to escape. (Tr. 699). He turned around, and Stickland handed him the broken 20-gauge shotgun, while Strickland was loading the 12-gauge shotgun. (Tr. 700). Petitioner ran out the front door and heard two or three more shots. (Tr. 700). He got caught in a fence, because he weighed about 325 pounds at the time, but Strickland ran out of the house and helped petitioner get over the

5

fence. (Tr. 700).

Petitioner further testified that he and Strickland were running together until they reached a pond, and petitioner threw the broken 20-gauge shotgun in the water. (Tr. 700-01). Strickland gave petitioner the 12-gauge shotgun and told him to get rid of it, because Strickland had shot Mr. Murphy with it. (Tr. 701). Strickland then took off and told petitioner not to tell the police they were together. (Tr. 701). Petitioner got a ride from Jessie Lopez to Kevin Lightfoot's house, and Lightfoot took him home. (Tr. 701-02). Petitioner packed a bag and rode with truckers to Canada. (Tr. 703).

**Procedural History**

Petitioner's Judgments and Sentences in CF-97-53 were affirmed by the Oklahoma Court of Criminal Appeals (OCCA) in *Mitchell v. State*, No. F-99-1272 (Dec. 18, 2000). After discovering the existence of allegedly exculpatory evidence, petitioner filed an application for post-conviction relief which was denied. *State v. Mitchell*, No. CF-97-53, slip op. at 2 (Latimer County Dist. Ct. Feb. 15, 2006). He appealed to the OCCA alleging, among other things, there was a reasonable probability that the outcome of his trial would have been different, if he had been provided the videotape of James Strickland's polygraph examination and Strickland's interview with law enforcement officers following the polygraph examination. *Mitchell v. State*, No. PC-2006-270, slip op. at 2 (Okla. Crim. App. Sept. 21, 2006). The OCCA found as follows in its Order Affirming Denial of Post-Conviction Relief:

> Petitioner asserts the critical question at trial was who actually fired the shots as alleged in the charge of Shooting with Intent to Kill, and the jury had to choose whom to believe, either him or Strickland. Petitioner contends the District Court improperly minimizes the fact the State improperly and falsely bolstered Strickland's credibility to the jury and erred in finding the videotape may not have affected the outcome of his trial.

Regarding the videotape of Strickland's polygraph examination and subsequent interview, the District Court agreed Petitioner had not seen the videotape prior to trial. The court also found the State had not deliberately concealed or withheld the videotape from Petitioner. Nevertheless, the District Court determined that polygraph results are viewed as unreliable by courts and are inadmissible for any purpose which includes proving the reliability of a witness; therefore, any possible harm caused by the Prosecutor's question has not been enhanced merely because Petitioner has new information which lowers his confidence in the polygraph results. Thus, the District Court found that any admissible exculpatory or impeachment evidence obtained through the videotape would not have changed the outcome of the proceeding with a reasonable probability.

[T]he District Court found the State presented evidence in addition to Strickland's testimony, including very persuasive forensic evidence, placing Petitioner at the scene of the crimes, at the time the crimes were committed. Where there was overwhelming evidence Petitioner and Strickland had each participated in the crimes, the court admitted there was less certainty as to which individual had actually fired the shot, which formed the basis for the charge of Shooting with Intent to Kill. Nevertheless, the court concluded the jury was presented with ample evidence to find Petitioner guilty of the crimes, and even if Petitioner had been provided with the videotape of Strickland's polygraph examination and interview, there was not a reasonable probability the outcome of the trial would have changed.

*Mitchell*, No. PC-2006-270, slip op. at 4-5.

**Standard of Review**

Under the Anti-Terrorism and Effective Death Penalty Act, federal habeas corpus relief is proper only when the state court adjudication of a claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> As to the "unreasonable application" standard, . . . only the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254. . . . [A] decision is "objectively unreasonable" when most reasonable jurists exercising their independent judgment would conclude the state court misapplied Supreme Court law. It is not enough that the decision is clearly wrong or that the reviewing court would have reached a contrary decision. . . . [T]he state court decision must be at such tension with governing U.S. Supreme Court precedents, or so inadequately supported by the record, or so arbitrary as to be unreasonable.

*Sandoval v. Ulibarri*, 548 F.3d 902, 908 (10th Cir. 2008) (quoting *Maynard v. Boone*, 468 F.3d 665, 671 (10th Cir. 2006)), *cert. denied*, ___ U.S. ___, 130 S.Ct. 133 (2009) .

**Forensic Evidence**

As set forth above, the OCCA agreed with the state district court that there was "very persuasive forensic evidence" that placed petitioner at the scene when the crimes were committed. *Mitchell*, No. PC-2006-270, slip op. at 5. There was, however, "less certainty" about which man fired the shot forming the basis for the charge of Shooting with Intent to Kill. *Id.*

The record shows there was extensive collection and analysis of forensic evidence from the crime scene, and numerous experts testified about that evidence. Fingerprints, blood, and tooth or bone fragments matching petitioner were recovered from the scene. (Tr. 524-531, 576, 583-85). A forensic dental consultant testified that petitioner had three missing teeth and a fractured molar, consistent with a gunshot wound in the cheek. (Tr. 488-90). The dental X rays also revealed metal fragments, consistent with bullet fragmentation. (Tr. 490-91).

Regarding the weapons used in the crime, an OSBI firearm and tool mark examiner testified he tested a revolver and four rounds of ammunition, and he determined that a bullet

found at the crime scene had been fired from the revolver. (Tr. 548). He also examined a 12-gauge double-barreled shotgun and shotgun shells, spent shells, pellets, and wadding found at the Murphy residence and determined the wadding was consistent with 20-gauge and 12-gauge wads. (Tr. 549-54). Therefore, both 20-gauge and a 12-gauge weapons were used to produce the wads. (Tr. 554). In addition, the shot shells were 20-gauge, and the 12-gauge double-barreled shotgun found at the scene was capable of being fired. (Tr. 554-55).

While all of the forensic evidence confirmed petitioner's presence at the crime scene, none of it revealed the answer to the question of who was the shooter. In fact, OSBI Criminalist Iris Dalley admitted in her testimony that the physical evidence did not reveal who fired the shots. (Tr. 34). Therefore, any reliance on this evidence by the OCCA in ascertaining who shot Mr. Murphy was misplaced and "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1).

**The Videotaped Interview**

Petitioner's habeas corpus claim is based on the prosecution's failure to produce the videotaped polygraph and subsequent interview of James Strickland. In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

The jury had to decide whether petitioner or James Strickland fired the shots as

9

alleged in the charge of Shooting with Intent to Kill, and whether the elements of Shooting with Intent to Kill were proven beyond a reasonable doubt. Petitioner asserts James Strickland's videotaped polygraph and follow-up interview contained critical exculpatory and impeachment evidence, and the prosecution's failure to provide the videotape to the defense denied him a fair trial. The respondent maintains that any inconsistencies are minor, and the discrepancies in Strickland's interview and trial testimony would not have allowed for meaningful impeachment. The respondent also argues that even if all of Strickland's testimony had been discounted, the jury's verdict would not have been altered, based on other physical and testimonial evidence at trial.

At petitioner's post-conviction evidentiary hearing, the prosecution admitted the exculapatory and impeachment value of the videotape and that Strickland made statements in the videotape that were inconsistent with his trial testimony. (Docket #8, Exhibit 12 at 110, 116-17). One inconsistent statement was his trial testimony that petitioner said, "If you come out in the hallway, I will kill you." *Id.* at 115. The other inconsistency was that Strickland initially said on the videotape that he did not hear any gunshots when he ran out the front door, but at trial he testified he heard one shot after he ran out the front door. *Id.* Petitioner argues these two inconsistencies could have been used effectively to undermine Strickland's testimony.

Strickland testified at trial that in August 1997 petitioner offered him $200 "to go help him beat up a guy ... break a leg, run him out of town." (Tr. 192-93). The intended victim was Dan Murphy, who was CEO at Mitchell's father's place of employment, Kiamichi Electric Cooperative. (Tr. 193). Mitchell wanted to prevent Mr. Murphy from attending a meeting the next day, because Mitchell's father was in trouble at work and was about to lose

10

his job. (Tr. 193). Petitioner paid Strickland the $200 the night of the attack. (Tr. 195). After dressing in camouflage, Strickland and petitioner drove in separate vehicles to Kevin Lightfoot's garage. (Tr. 197). Strickland observed that petitioner had a pump shotgun, a double-barreled shotgun, and a club to which he had taped a chain. (Tr. 197-98). Petitioner also was dressed in camouflage clothing, and he took a leather saddle holster to hold the club. (Tr. 199-200). Kevin Lightfoot drove Mitchell and petitioner to the Murphys' home and then dropped them off about a quarter of a mile from the residence. (Tr. 200-01).

When they got out of the car, petitioner had the double-barreled shotgun and the holster, and Strickland carried the pump shotgun. (Tr. 202-03). They walked to the Murphys' home and approached the front of the house. (Tr. 204). Petitioner opened the screen door at the front of the house and then removed the screen from a window. (Tr. 204-05). Petitioner cut the phone lines, entered through the window, and opened the front door through which Strickland entered the house, still holding the pump shotgun. (Tr. 205-06, 229-30).

Petitioner began making noise to wake Mr. and Mrs. Murphy, and Strickland saw Mr. Murphy come into the kitchen. (Tr. 207). Strickland then heard a crack, and concluded that petitioner had hit Mr. Murphy with the club. (Tr. 208, 227). Strickland saw Mr. Murphy sitting on the floor with blood running down his face and then heard two shots that sounded like they were from a revolver or pistol. (Tr. 208-09, 227-28). Petitioner said, "Shoot the bitch that shot me." (Tr. 209, 228, 236). In response, Strickland shot the kitchen floor once with the pump shotgun. (Tr. 210, 228, 236). Petitioner then grabbed Strickland from behind and pushed him into the kitchen ahead of him, using Strickland as a shield to protect himself. (Tr. 211). The pump shotgun broke as the two men struggled. (Tr. 211, 228). Strickland

11

ended up with the butt stock, and petitioner had the remainder of the gun. (Tr. 211, 237).

Strickland noticed that the man on the floor had gotten to his feet and was running to the back fo the house. (Tr. 212, 228). When Strickland got away from petitioner, he tried to escape through a door to the utility room, but it was locked, so he left through the front door where he had entered. (Tr. 212, 228). As Strickland was leaving, he heard petitioner yell, "If you come back out, I will kill you." (Tr. 212-13). As he was running from the house, Strickland heard a shot that sounded like a shotgun. (Tr. 213). Strickland ran back to Kevin Lightfoot's house, and Lightfoot asked him if he knew someone who could remove a bullet in petitioner's face (Tr. 213-14).

Petitioner and Strickland each claimed to have left the house before the other. (Tr. 212, 700). Each also testified he heard gunshots after running from the house, blaming each other for shooting Mr. Murphy. (Tr. 213, 700). Petitioner maintains that Stickland's testimony on this critical issue was inconsistent with his videotaped interview.

During the videotaped interview Strickland initially told the agents that he did not hear any shots after he ran from the house. He mentioned only the two shots he heard from the Murphys' weapon and the shot he fired into the floor. Petitioner maintains that it was only after Agent Allmon coached and led Strickland that Strickland changed his statement to say he heard another shot after he ran from the residence:

MR. JEFFRIES: Did you hear any more shots?

MR. STRICKLAND: No.

MR. JEFFRIES: You heard two shots from them and the one shot you fired?

MR. STRICKLAND: Yeah.

12

MR. ALLMON: When you're going out the door around the house, you don't hear Trevor shooting any?

MR. STRICKLAND: Yes, I did.

MR. ALLMON: Okay.

MR. STRICKLAND: Yes. I heard him shoot when I was going outside--going out the door and he shot--now, apparently he shot down the hallway or--or I don't even know where Mr. Murphy was at--at that point, but I was going out the door, I was--I was out of the yard.

MR. ALLMON: How many shots did you hear?

MR. STRICKLAND: I just heard one. To the best of my remembrance, I just heard one.

(Docket #8, Exhibit 5 at 24-25).

After a careful review of the videotape, the court finds there is not a reasonable probability that this inconsistency would have resulted in a different trial outcome. While Strickland did change his statement in the interview, the court finds that under the difficult circumstances of the interview, the agent was assisting Strickland in recalling the events at the Murphys' house. There is no evidence of the agent's "pressuring" Strickland, as petitioner alleges, considering petitioner already had been interviewed "15 times." (Docket #8, Exhibit 5 at 34).

Gloria Wupori testified at trial that petitioner confessed to shooting someone during the confrontation when he was shot in the face. (Tr. 363-64). Therefore, even if the videotape had been available to challenge Strickland's credibility, there still was additional, credible evidence that petitioner was the shooter. The court, therefore, finds the Court of Criminal Appeals' determination that petitioner was the shooter was consistent with federal

13

law, pursuant to 28 U.S.C. § 2254(d).

The court, however, reaches a different conclusion about whether the videotape would have changed the trial outcome with respect to whether the State proved beyond a reasonable doubt that petitioner had the intent to kill Mr. Murphy. The elements of the crime of Shooting with Intent to Kill are:

<u>First</u>, intentional and wrongful;

<u>Second</u>, shooting another person;

<u>Third</u>, with the intent to take a human life.

(Tr. 816, O.R. 224; Okla. Stat. tit. 21, § 652(A)).

At trial the prosecution proved the element of intent by Strickland's testimony that he heard petitioner yell, "If you come back out, I will kill you." (Tr. 212-13). Strickland did not, however, make this statement on the videotape. Furthermore, Mrs. Murphy did not testify she heard anyone shout this warning. Instead, she heard "mumbling" while she was in the bedroom trying to reload her gun, and then a loud fire alarm sounded outside the bedroom door. (Tr. 137). She could not hear anything over the fire alarm. (Tr. 137).

> CINDY MURPHY: Before the alarm went off I heard mumbling in the kitchen. I just heard blah-blah, like that. I just heard somebody mumbling. So I knew that they were, you know, they didn't flee the house right then but then the alarm went off immediately after that.

(Tr. 137).

Strickland's trial testimony that petitioner said he would kill anyone who came out was not supported by Mrs. Murphy's testimony, and the defense did not question how Strickland could have heard the threat over the fire alarm. More important, Strickland repeatedly stated in the videotape that as petitioner and Strickland walked to the Murphys'

14

house, petitioner told him to shoot Mr. Murphy "in the legs" if anything happened in the house. (Docket #8, Exhibit 5 at 16-19, 23). Strickland said he had no idea of whether petitioner intended to kill Mr. Murphy, but the "plan" was to beat up Mr. Murphy, break his legs or ribs, and run him out of town. *Id.* at 18, 26. Strickland made no mention in the that petitioner intended to kill anyone when they broke into the house.

> "[E]vidence is material . . . if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Ritchie*, 480 U.S. 39, 57 (1987) (quotation and alteration omitted). A defendant need not show that the withheld records would have "resulted ultimately in [his] acquittal." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Rather, "the touchstone is simply whether the ultimate verdict is one 'worthy of confidence.'" *United States v. Ford*, 550 F.3d 975, 993 (10th Cir. 2008) (Gorsuch, J., dissenting) (quoting *Strickler v. Greene*, 527 U.S. 263, 290 (1999)). This materiality test applies with equal force to both exculpatory and impeachment evidence. *Bagley*, 473 U.S. at 676.

*United States v. Robinson*, 583 F.3d 1265, 1270-71 (10th Cir. 2009) (footnote omitted).

Here, the court finds there was no evidence of petitioner's intent to kill, except for Strickland's testimony that he heard petitioner shout a threat to kill whoever came out. This evidence is absent in the videotaped interview, and no other evidence supported petitioner's intent to kill. Petitioner could have used the interview to undermine Strickland's testimony that petitioner made the death threat before shooting Mr. Murphy. The court, therefore, finds this evidence was material, and if petitioner had received the videotape prior to trial, there is a reasonable probability the outcome of the trial would have been different. The court further finds that the Court of Criminal Appeals' determination of this issue resulted in a decision that was contrary to, or involved an unreasonable application of *Brady v. Maryland*.

15

28 U.S.C. § 2254(d)(1).

**ACCORDINGLY**, the Magistrate Judge recommends that habeas corpus relief be granted for petitioner's claim that he was denied a fair trial by the State's failure to provide the videotaped interview that could have been used to impeach James Strickland's testimony about petitioner's intent to kill Mr. Murphy.

Pursuant to 28 U.S.C. § 636(b)(1)(C), the parties are given ten (10) days from being served with a copy of this Report and Recommendation to file with the Clerk of the Court any objections with supporting briefs. Failure to file timely written objections to the Magistrate Judge's recommendations may result in waiver of appellate review of factual and legal questions. *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996); *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991).

**DATED** this 14th day of December 2009.

KIMBERLY E. WEST
UNITED STATES MAGISTRATE JUDGE

16